JULIUS KRETZ

*v.*

SOPHIE KRETZ.

</div>

[Submitted June 3d, 1907. Decided June 24th, 1907.]

1. A husband is not entitled to divorce on the ground of adultery, where the wife at the time of the commission thereof was insane.

2. Though there may be some doubt as to the right of the court of chancery in a suit for divorce on statutory grounds to enforce purely equitable rules and maxims against the complaining party, yet where that question has been considered in this state the right has been recog-nized.

On bill for divorce.

*Mr. William T. Boyle,* for the complainant.

*Mr. Thomas P. Curley,* for the defendant.

LEAMING, V. C.

The bill is filed by complainant for the procurement of a decree of divorce against defendant on the ground of adultery. The answer of defendant denies the adultery charged. During the progress of the trial it became manifest that defendant was insane. A guardian *ad litem* was then appointed, who

answered for the defendant, denying the commission of the adultery charged, and also averring that at the time of the alleged adultery defendant was insane. Complainant now admits that defendant is insane at this time, but insists that the insanity did not exist at the time the adultery is alleged to have been committed, and further insists that even though the insanity of defendant in fact existed at the time of the alleged offence, that fact will not operate as a defence. As to the latter claim complainant relies upon the case of *Matchin* v. *Matchin, 6 Pa. St. 332.* In that case it is held that, although insanity will operate as a defence to a criminal charge of adultery, principles of public policy require that the insanity of a wife at the time of the commission of the offence shall not be permitted to defeat the right of a husband to a divorce based upon the offence. The theory of the decision appears to be that the paramount purposes of marriage are the procreation and protection of legitimate children, the institution of families and the creation of natural relations among mankind, and that these public considerations so far outweigh the private interests of the immediate parties that the marriage relation will be dissolved for the offence named, when committed by the wife, notwithstanding her insanity at the time of the commission of the act. I am unable to accept the views expressed in the *Matchin Case.* For a husband to cast off a wife for an act committed by her while insane impresses me as scarcely less than barbarous, and as wholly inconsistent with the necessities arising from social conditions. If society has any demand to assert in such a case, it is a demand for the protecting care of the husband alike before and after the unfortunate act. The principles of the *Matchin Case* would require a court to grant a decree of divorce to a husband whose wife had been the victim of a rape. I am unable to conceive how any court can properly give sanction to the views expressed in the case under review, and I must decline to recognize it as a binding precedent. No other court, so far as I have been able to discover, has given sanction to the views expressed in the *Matchin Case,* while the very contrary has been established by the courts of several states. *Nichols* v. *Nichols, 31 Vt. 328; Broadstreet* v. *Broadstreet, 7 Mass.*

474; Wray v. Wray, 19 Ala. 522; Mims v. Mims, 33 Ala. 98; Wray v. Wray, 19 Ala. 187. See, also, Yarrow v. Yarrow (1892), L. R. Prob. 92, and Hill v. Hill, 27 N. J. Eq. (12 C. E. Gr.) 214. In 1 Bish. Mar. & D. § 712, it is stated that the doctrine of Matchin v. Matchin has found no support. I conclude, therefore, that if defendant was insane at the time of the alleged adultery that fact constitutes a complete defence to the bill.

. It is probably impossible to determine with entire accuracy the condition of the mind of defendant at the date of the alleged offence. The offence is alleged to have been committed in January, 1906. For a number of years prior to that date the wife had indulged in alcoholic stimulants to such an extent that her mind had become enfeebled, and all the witnesses agree that her condition gradually grew worse until she finally became insane as the result of alcoholism. The only dispute is as to the exact time when she may be said to have reached that condition. About six months before the alleged offence her husband filed a petition for her commitment to an asylum for the insane, based upon an allegation of her insanity. Doctors Bray and Horning then examined her and certified that she was a proper person for commitment to the asylum. She was not committed, but the reason why the proceedings were discontinued does not fully appear. Dr. Bray now testifies that she was not then insane, but that he recommended her commitment on account of her condition, which he describes as "alcoholism," as distinguished from insanity. His testimony is that alcoholism is not insanity, but that insanity is the result of alcoholism, and that while she has reached the condition of insanity at this time, she had not reached that condition at the time named. Dr. Horning, who was the family physician, testifies that she was then insane and that she had been insane from a time long prior to the date of the alleged offence. As family physician his opportunity for knowing her exact condition was much superior to that of Dr. Bray. Neither of the physicians profess to be specialists in mental diseases, although Dr. Bray appears to have given the subject the more extended consideration. The other witnesses touching the mental condition throw little light upon the question as to just when defendant may

have first reached her present unfortunate condition. Upon the whole testimony my best judgment is that if defendant had not at the time of the alleged commission of the offence named reached a mental condition which may be technically defined as insanity, she had reached a mental condition so far from normal that to charge her with full responsibility for her conduct would be inconsistent with the principles upon which equitable relief is uniformly founded. She was then, at the very least, in a mental condition where no one could properly expect from her the complete exercise of a rational judgment, although it appears impossible to say with positiveness that she may not have then known right from wrong. Upon this branch of the case my conclusion is that defendant's mind was so far impaired at the date of the alleged offence that no decree can properly be made against her based upon the acts charged.

Another feature of the case merits attention. Whether defendant was technically sane or insane in January, 1906, it is entirely clear that at that time her condition was such as to demand from her husband his most solicitous care and attention. Only six months prior to that date he had alleged that she was insane and sought her commitment on that ground. His testimony now is that he sought the commitment in the hope that confinement in an asylum would operate to cure her habit of intemperance; but whatever his belief may have been at that time as to her sanity, he was fully aware of her unfortunate condition, and owed to her the utmost care and attention. Instead of bestowing upon her that care which her condition demanded he went to Europe in December, 1905, and remained absent until February, 1906, leaving defendant entirely alone and unprotected in her home during all of that time. During that period of absence the offence now in question is alleged to have occurred. I am impressed that under such circumstances the primary responsibility for the act charged may be said to equitably rest upon the husband. By a proper observance of his plain duty to his wife the offence now charged against her could not have occurred, and, on the other hand, his conduct was such that he should have reasonably anticipated the happening of exactly that which he now

charges. I am not unmindful of the fact that the neglect of a husband to perform his duties to his wife will not ordinarily excuse her infidelity, even though such neglect may be a natural and probable cause for her wrongful act; but where, as in the present case, a husband knows his wife to be utterly incapable of protecting herself against evil-doers, there can be but slight difference between leaving her alone and unprotected for so long a period and a deliberate procurement of her infidelity. In *Derby* v *Derby, 21 N. J. Eq. (6 C. E. Gr.) 40*, Chancellor Zabriskie said: "A party who has negatively violated a solemn contract in its two most vital parts, to love and cherish, and has only performed it in the last and least, to support, comes into a court of equity with an ill grace to complain of a positive breach by the party whom he first injured. His hands are not unclean in the sense which would apply if he had committed the same crime, but they were so weakened, blanched and attenuated by willful non-performance, that they take but feeble hold on the horns of the altar of justice. Such a complainant cannot expect any favorable leaning of the court, but must present a case free from any reasonable doubt." These views I heartily endorse. There may be some doubt as to the right of this court in a suit for divorce on statutory grounds to enforce purely equitable rules and maxims against the complaining party; but so far as that question has been considered in this state the right has been recognized, and I think rightfully so. *Rooney* v. *Rooney, 54 N. J. Eq. (9 Dick.) 231, 242.* Under the views already expressed I am compelled to deny to complainant the relief sought. This leaves it unnecessary for me to pass upon the sufficiency of the evidence offered to establish the fact of adultery, and I, therefore, express no opinion on that subject.

I will advise a decree dismissing the bill.